665 S.E.2d 631

Beaulah PLATT, as guardian for Asia Platt, a minor under the age of fourteen years, as Personal Representative of the Estate of Valerie Marie Platt, deceased, and as Personal Representative of the Estate of William Leroy Platt, deceased, Appellant,

v.

CSX TRANSPORTATION, INC., and South Carolina Department of Transportation, Defendants, of whom South Carolina Department of Transportation is Respondent.

No. 4394.

Court of Appeals of South Carolina.

Heard May 6, 2008.
Decided May 20, 2008.
Rehearing Denied Aug. 26, 2008.

252

David L. Savage, of Charleston; Ronnie Lanier Crosby, of Hampton, for Appellant.

Jonathan J. Anderson, Lisa A. Reynolds, and Eric M. Johnsen, all of Charleston, for Respondent.

ANDERSON, J.

Beaulah Platt, as guardian of Asia Platt and as personal representative of the estates of Valerie Platt and William Leroy Platt, appeals the trial court's grant of summary judg-

ment in favor of the South Carolina Department of Transportation (Department). Platt contends: (1) the Department had a duty to protect the public from the dangerous condition created by a malfunctioning railroad warning device; (2) the trial court improperly held the Department satisfied its duty by informing CSX Transportation, Inc. (CSX) of the malfunctioning signals; and (3) the Department's negligence in failing to maintain the traffic signals in compliance with the signal plans was a proximate cause of the collision. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

On June 19, 1999, William Corley was driving Valerie Platt, Asia Platt, and William Corley Jr., in his automobile on Red Bank Road toward Highway 52 in Goose Creek, South Carolina.[1] Red Bank Road intersects both Highway 52 and a CSX railroad track, which are parallel to one another. In the direction Corley was traveling, he would cross over the railroad tracks before entering the Red Bank Road and Highway 52 intersection. There were railroad crossing arms and warning lights approximately two car lengths on either side of the railroad tracks.

As Corley approached the intersection of Red Bank Road and Highway 52, traffic was stopped at the traffic signal. While Corley waited, the railroad track crossing arms and warning lights activated and lowered in front of his vehicle. A train did not pass, the crossing arms lifted, and Corley drove forward. Soon thereafter, the crossing arms again lowered, placing Corley's vehicle between the crossing arms and the railroad tracks. Testimony differs regarding Corley's actions at this point, but it appears Corley backed up at least once to ensure his vehicle was clear from the tracks. At least one vehicle was in front of Corley's but on the other side of the tracks between the tracks and the stop light at Highway 52. Prior to the train's arrival, no vehicles blocked Corley's forward progress to the intersection. Corley drove forward and was struck by an oncoming CSX train. Asia Platt was the

---

1. William Corley and Valerie Platt considered themselves to be common law married. Asia Platt and William Corley Jr., were their two children.

sole survivor in the vehicle, and has since been cared for by her maternal grandmother, Beaulah Platt.

Beaulah Platt, as the guardian for Asia Platt and personal representative of the estates of Valerie and William Platt, filed a negligence action against CSX and the Department. Beaulah Platt and CSX reached a settlement agreement prior to oral argument on the Department's summary judgment motion. The trial court granted the Department's summary judgment motion, finding: (1) the Department fulfilled its duty by reporting defects in the warning signals to CSX; (2) the Department had no duty to make repairs of the crossing arms; (3) the Code of Federal Regulations vests only CSX with the duty to maintain crossing signals; and (4) the proximate cause of the collision was a malfunction of the crossing arms and not the Department's traffic signals.

## STANDARD OF REVIEW

When reviewing a grant of summary judgment, the appellate court applies the same standard which governs the trial court under Rule 56(c), SCRCP, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Pye v. Estate of Fox*, 369 S.C. 555, 633 S.E.2d 505 (2006); *Houck v. State Farm Fire & Cas. Ins. Co.*, 366 S.C. 7, 11, 620 S.E.2d 326, 329 (2005); *Bradley v. Doe*, 374 S.C. 622, 649 S.E.2d 153 (Ct.App.2007); *Bennett v. Investors Title Ins. Co.*, 370 S.C. 578, 635 S.E.2d 649 (Ct.App.2006); *see* Rule 56(c), SCRCP ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In determining whether any triable issues of fact exist, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party. *Helms Realty, Inc. v. Gibson–Wall Co.*, 363 S.C. 334, 611 S.E.2d 485 (2005); *Medical Univ. of S.C. v. Arnaud*, 360 S.C. 615, 602 S.E.2d 747 (2004); *Hackworth v. Greenville County*, 371 S.C. 99, 102, 637 S.E.2d 320, 322 (Ct.App.2006); *Rife v. Hitachi Constr. Mach. Co., Ltd.*, 363 S.C. 209, 609 S.E.2d 565 (Ct.App.2005).

"Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *BPS,* 362 S.C. at 325, 608 S.E.2d at 159; *see also Higgins v. Medical Univ. of South Carolina,* 326 S.C. 592, 486 S.E.2d 269 (Ct.App. 1997) (a trial judge considering a motion for summary judgment must consider all documents and evidence within the record, including pleadings, depositions, answers to interrogatories, admissions on file, and affidavits). "On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the non-moving party below." *Catawba Indian Tribe of South Carolina v. The State of South Carolina,* 372 S.C. 519, 524, 642 S.E.2d 751, 753 (2007).

Summary judgment is not appropriate where further inquiry into where further inquiry into the facts is desirable to clarify the application of the law. *Brockbank v. Best Capital Corp.,* 341 S.C. 372, 534 S.E.2d 688 (2000); *Tupper v. Dorchester County,* 326 S.C. 318, 487 S.E.2d 187 (1997). Even when there is no dispute as to evidentiary facts, summary judgment is not appropriate if there is disagreement concerning the conclusion to be drawn from those facts. *Moriarty v. Garden Sanctuary Church of God,* 341 S.C. 320, 534 S.E.2d 672 (2000); *Ellis v. Davidson,* 358 S.C. 509, 595 S.E.2d 817 (Ct.App.2004). However, when plain, palpable, and indisputable facts exist on which reasonable minds cannot differ, summary judgment should be granted. *BPS,* 362 S.C. at 325, 608 S.E.2d at 159.

The purpose of summary judgment is to expedite the disposition of cases which do not require the services of a fact finder. *Dawkins v. Fields,* 354 S.C. 58, 69, 580 S.E.2d 433, 438 (2003) (quoting *George v. Fabri,* 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001)); *Moore v. Weinberg,* 373 S.C. 209, 217, 644 S.E.2d 740, 744 (Ct.App.2007); *Mulherin–Howell v. Cobb,* 362 S.C. 588, 596–97, 608 S.E.2d 587, 592 (Ct.App.2005). Because summary judgment is a drastic remedy, summary judgment should be cautiously invoked to ensure a litigant is not improperly deprived of a trial on disputed factual issues. *Helena Chem. Co. v. Allianz Underwriters Ins. Co.,* 357 S.C.

631, 644, 594 S.E.2d 455, 462 (2004); *B & B Liquors, Inc. v. O'Neil,* 361 S.C. 267, 270, 603 S.E.2d 629, 631 (Ct.App.2004).

## *LAW/ANALYSIS*

### I. Public Duty Rule

Platt avers the Department had a duty to protect the public from a dangerous condition created by the malfunctioning warning device. We disagree.

■ The public duty rule was originally adopted by the South Carolina Supreme Court in *Parker v. Brown,* 195 S.C. 35, 52, 10 S.E.2d 625, 632 (1940):

> The law necessarily grants certain discretion to its officers in handling the public business. In one instance it may be wise for a public officer to pursue one course, in another instance, another course. Those charged with protecting the public interest should view that interest as supreme, should consider what is best for the public, and should be free at all times to prosecute the course that appears to be in the public interest.... It is well settled that an individual has no right of action against a public officer for breach of a duty owing to the public only, even though such individual be specially injured thereby. Where a duty is owing to the public only, an officer is not liable to an individual who may have been incidentally injured by his failure to perform it.

Under South Carolina's public duty doctrine, public officials are not liable to individuals for their negligence in discharging public duties as the duty is owed to the public at large rather than to anyone individually. *Tanner v. Florence Co. Treasurer,* 336 S.C. 552, 561, 521 S.E.2d 153, 158 (1999); *Jensen v. Anderson County Dep't of Soc. Servs.,* 304 S.C. 195, 199, 403 S.E.2d 615, 617 (1991); *Arthurs v. Aiken County,* 338 S.C. 253, 262, 525 S.E.2d 542, 546 (Ct.App.1999) (*Arthurs I*) *aff'd as modified,* 346 S.C. 97, 551 S.E.2d 579 (2001) (*Arthurs II*).

■ The public duty rule is not a separate legal doctrine. *Arthurs I,* 338 S.C. at 262, 525 S.E.2d at 546; *Rayfield v. S.C. Dep't of Corr.,* 297 S.C. 95, 105, 374 S.E.2d 910, 915 (Ct.App. 1988). The public duty rule is a special application of the broader principle that an action for negligence based upon an alleged violation of a statute cannot be maintained if the

statute was enacted for a purpose other than preventing the complained of injury. *Arthurs I,* 338 S.C. at 262, 525 S.E.2d at 546; *Rayfield,* 297 S.C. at 105, 374 S.E.2d at 915. The rule applies to the special case of statutes which create or define the duties of a public office. *Rayfield,* 297 S.C. at 105, 374 S.E.2d at 915.

An essential element in a negligence cause of action is the existence of a legal duty of care owed by the defendant to the plaintiff. *Wyatt v. Fowler,* 326 S.C. 97, 101, 484 S.E.2d 590, 592 (1997); *Rogers v. S.C. Dep't of Parole and Cmty. Corr.,* 320 S.C. 253, 255, 464 S.E.2d 330, 332 (1995). Without such a duty, there can be no actionable negligence. *Rogers,* 320 S.C. at 255, 464 S.E.2d at 332. To prevail in a negligence action, a plaintiff must demonstrate: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach. *Tanner,* 336 S.C. at 561, 521 S.E.2d at 158. The court must determine, as a matter of law, whether the law recognizes a particular duty. *Steinke v. S.C. Dep't of Labor, Licensing & Regulation,* 336 S.C. 373, 387, 520 S.E.2d 142, 149 (1999); *see also Rogers v. Atl. Coast Line R.R.,* 222 S.C. 66, 71 S.E.2d 585 (1952) (whether defendant is under legal duty to plaintiff is question of law for court); *Araujo v. S. Bell Tel. and Tel. Co.,* 291 S.C. 54, 351 S.E.2d 908 (Ct.App.1986) (question of whether defendant owes duty, the breach of which may constitute negligence, is a question of law, not of fact).

Ordinarily, there is no common law duty to act. *Arthurs I,* 338 S.C. at 264, 525 S.E.2d at 547. However, an affirmative legal duty may be created by statute, contract relationship, status, property interest, or some other special circumstance. *Jensen,* 304 S.C. at 199, 403 S.E.2d at 617. Many statutes impose an affirmative duty on public officials to perform certain acts. *Arthurs I,* 338 S.C. at 264, 525 S.E.2d at 547; *Wells v. City of Lynchburg,* 331 S.C. 296, 306, 501 S.E.2d 746, 752 (Ct.App.1998). Normally, such officials enjoy immunity from a private cause of action under the public duty rule. *Wells,* 331 S.C. at 307, 501 S.E.2d at 752. This rule limits public officials' liability to individuals for their negligence in discharging public duties as the duty is owed to the

public at large rather than an individual. *Id.* Thus, when the duty is owed to the public in general, the official is not liable to an individual who may have been incidentally injured by the failure to perform the duty. *Id.* An exception to the general rule against liability exists when a duty is owed to specific individuals rather than the public at large. *Id.* .

■ The public duty rule "presumes statutes which create or define the duties of a public office have the essential purpose of providing for the structure and operation of government or for securing the general welfare and safety of the public." *Arthurs I,* 338 S.C. at 265, 525 S.E.2d at 548; *Tanner,* 336 S.C. at 562, 521 S.E.2d at 158; *Wells,* 331 S.C. at 308, 501 S.E.2d at 752. Generally, such statutes create no duty of care towards individual members of the public. *Arthurs I,* 338 S.C. at 265, 525 S.E.2d at 548. An exception is recognized where the plaintiff can establish the defendant owed a special duty of care to the plaintiff. *Bellamy v. Brown,* 305 S.C. 291, 294, 408 S.E.2d 219, 221 (1991); *Arthurs I,* 338 S.C. at 265, 525 S.E.2d at 548; *Wells,* 331 S.C. at 308, 501 S.E.2d at 752.

■ To determine if a special duty is owed to the plaintiff, the court looks to the statute and the facts of the particular case. *Arthurs I,* 338 S.C. at 265, 525 S.E.2d at 548. In *Rayfield,* 297 S.C. at 106, 374 S.E.2d at 916, this court articulated a six-part test for determining whether a statute creates a special duty to an individual member of the public:

(1) an essential purpose of the statute is to protect against a particular kind of harm; (2) the statute, either directly or indirectly, imposes on a specific public officer a duty to guard against or not cause that harm; (3) the class of persons the statute intends to protect is identifiable before the fact; (4) the plaintiff is a person within the protected class; (5) the public officer knows or has reason to know of the likelihood of harm to members of the class if he fails to do his duty; and (6) the officer is given sufficient authority to act in the circumstances or he undertakes to act in the exercise of his office.

*See also Jensen,* 304 S.C. at 200, 403 S.E.2d at 617 (wherein the supreme court adopted the *Rayfield* six step special duty analysis as an exception to the public duty rule). A plaintiff

may prevail against a public duty defense if the statute not only concerns the duties of a public office, but has the essential purpose of protecting identifiable individuals from a particular kind of harm. *Arthurs I*, 338 S.C. at 265, 525 S.E.2d at 547–48. In such cases, the statute creates a special duty which may give rise to a negligence suit against an officer for failure to perform his duties properly. *Id.*

South Carolina courts have been "reluctant to find special duties statutorily imposed." *Tanner*, 336 S.C. at 562, 521 S.E.2d at 158. *See, e.g., Brady Dev. Co. v. Town of Hilton Head Island*, 312 S.C. 73, 439 S.E.2d 266 (1993) (holding city owed lot purchaser no special duty of care in issuing development permit under municipal development standards ordinance, and thus, could not be held liable to purchaser for alleged negligence in issuing permit to developer); *Bellamy*, 305 S.C. at 291, 408 S.E.2d at 219 (finding statutorily prescribed exceptions to the disclosure requirements of the State's Freedom of Information Act did not establish a duty to maintain confidentiality); *Wells*, 331 S.C. at 296, 501 S.E.2d at 746 (ruling plaintiff could not sue city for failing to maintain fire hydrants because suit was barred by a provision of the Tort Claims Act and city owed duty only to public generally); *Summers v. Harrison Constr.*, 298 S.C. 451, 381 S.E.2d 493 (Ct.App.1989) (concluding a State statute requiring officers who issue building permits to secure evidence that the builders and renovators of residences are licensed did not create a special, actionable duty to protect homeowners); *Rayfield*, 297 S.C. 95, 374 S.E.2d 910 (explaining a State statute requiring prison and parole officials to prepare adequate reports concerning parole candidates did not create a special duty to protect particular members of the public against crimes committed by released prisoners).

In *Arthurs v. Aiken County*, 346 S.C. 97, 551 S.E.2d 579 (2001), the South Carolina Supreme Court first considered the public duty rule and its interplay with the South Carolina Tort Claims Act (Tort Claims Act). *See also Trousdell v. Cannon*, 351 S.C. 636, 641, 572 S.E.2d 264, 266–67 (2002). *Arthurs* confirmed the continuing viability of the public duty rule and its compatibility with the Tort Claims Act, but clarified when the public duty rule can be properly raised. *Trousdell*, 351 S.C. at 641, 572 S.E.2d at 266–67. The *Arthurs* court stated,

"[w]hen, and only when, the plaintiff relies upon a statute as creating the duty does a doctrine known as the 'public duty rule' come into play." *Id.* at 103, 551 S.E.2d at 582. In other words, when the plaintiff's negligence claim is founded upon a government entity's statutorily created duty, the question of "whether that duty will support the claim should be analyzed under the rule. On the other hand, where the duty relied upon is based upon the common law, . . . then the existence of that duty is analyzed as it would be were the defendant a private entity." *Id.* at 105, 551 S.E.2d at 583.

 Platt urges this court to find the Department had a statutory duty to protect the public pursuant to section 57–5–10 of the South Carolina Code (2006) which provides: "The state highway system shall consist of a statewide system of connecting highways which shall be constructed by the Department of Transportation and which shall be maintained by the department in a safe and serviceable condition as state highways . . . ." Because Platt's claim is based upon a statutorily created duty it must be analyzed under the public duty rule. Where, as here, the statutory duty is owed to the public as a whole, the "public duty rule" bars Platt from maintaining a negligence action against the Department. As a result, the public duty rule bars Platt's claims unless a special duty is owed by the Department.

Moreover, we find the Department did not owe a special duty of care to Asia Platt, Valerie Platt, and William Leroy Platt. From her brief, Platt contends the protected class is the "traveling public." However, this class is not found in the statute but rather is a *post hoc* class created in light of this tragic accident. S.C.Code Ann. § 57–5–10. Because the statute created no special duty from the Department to Asia Platt, Valerie Platt, and William Leroy Platt, the trial court properly granted the Department's summary judgment on the statutory duty claims.

## II. Federal Preemption

Platt maintains the trial court erred in finding the Department satisfied its duty to report defects in highway-rail grade crossing warning systems to CSX.

According to 49 U.S.C.A. § 20106 (West 2007), applicable federal regulations may pre-empt any state "law, rule, regulation, order, or standard relating to railroad safety." [2] Thus, the issue before the Court is whether the Secretary of Transportation (Secretary) has issued regulations covering the same subject matter as South Carolina law pertaining to malfunctioning crossing arms and false activations.

Where a state statute conflicts with, or frustrates, federal law, the former must give way. U.S. Const., Art. VI, cl. 2; *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). "In the interest of avoiding unintended encroachment on the authority of the states, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Thus, pre-emption will not lie unless it is "the clear and manifest purpose of Congress." *Id.; Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue. *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732; *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103

---

2. In August 2007, Congress amended § 20106 adding the following language:

(b) Clarification regarding State law causes of action.—

(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—

(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

(2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

(c) Jurisdiction.—Nothing in this section creates a Federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action.

S.Ct. 2890, 77 L.Ed.2d 490, (1983). If the statute contains an express pre-emption clause, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732.

In 1970, Congress enacted the Federal Railroad Safety Act (FRSA) "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C.A § 20101 (West 2007). The FRSA grants the Secretary the authority to "prescribe regulations and issue orders for every area of railroad safety," 49 U.S.C.A. § 20103(a) (West 2007), and directs the Secretary to "maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem." 49 U.S.C.A. § 20134(a) (West 2007). The FRSA also contains an express pre-emption provision, which articulates:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C.A. § 20106; *see also Norfolk Southern Ry. Co. v. Shanklin,* 529 U.S. 344, 348, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000).

"Three years after passing the FRSA, Congress enacted the Highway Safety Act of 1973, § 203, 87 Stat. 283, which, among other things, created the Federal Railway–Highway Crossings Program" (Crossings Program). *Shanklin,* 529 U.S. at 348, 120 S.Ct. 1467; *see* 23 U.S.C.A § 130 (West 2007). The Crossings Program makes funds available to states for the "cost of construction of projects for the elimination of hazards of railway-highway crossings." 23 U.S.C.A. § 130(a). To participate in the Crossings Program, all states must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C.A. § 130(d).

That schedule must, "[a]t a minimum, ... provide signs for all railway-highway crossings." *Id.*

One regulation promulgated by the Secretary, through the Federal Highway Administration (FHWA), addresses the adequacy of warning devices installed under the Crossings Program. 23 C.F.R. § 646.214(b). According to section 646.214(b)(3), adequate warning devices "on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals." Because these regulations "establish requirements as to the installation of particular warning devices ... when they are applicable, state tort law is pre-empted." *Shanklin,* 529 U.S. at 353, 120 S.Ct. 1467.

Additionally, the Secretary, through the Federal Railroad Administration (FRA), has promulgated several regulations for the design and installation of crossing warning devices and other areas of railroad safety. These regulations include additional preemption provisions:

> Under 49 U.S.C. 20106, issuance of these regulations preempts any State law, regulation, or order covering the same subject matter, except an additional or more stringent law, regulation, or order that is necessary to eliminate or reduce an essentially local safety hazard; is not incompatible with a law, regulation, or order of the United States Government; and that does not impose an unreasonable burden on interstate commerce.

49 C.F.R. § 213.2.

In *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), the United States Supreme Court addressed the pre-emptive effect of the FHWA's regulations implementing the Crossings Program. The *Easterwood* court explained the language of the FRSA's pre-emption provision dictates that, to pre-empt state law, the federal regulation must "cover" the same subject matter, and not merely " 'touch upon' or 'relate to' that subject matter." *Id.,* at 664, 113 S.Ct. 1732; *see also* 49 U.S.C.A. § 20106 (West 2007). Thus, "pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Easterwood,* at 664, 113 S.Ct. 1732.

In *Easterwood,* the Court concluded a wife's wrongful death action alleging a railroad company was negligent under Georgia law for failing to maintain adequate warning devices at a crossing was not pre-empted because the warning devices for which federal funds had been obtained were never actually installed at the crossing where the accident occurred. 507 U.S. at 673, 113 S.Ct. 1732. Conversely in *Shanklin,* the United States Supreme Court found state law tort claims for inadequacy of warning devices were pre-empted when the devices are *actually* installed with the *use of federal funds.* 529 U.S. at 359, 120 S.Ct. 1467 (emphasis added).

The Code of Federal Regulations in addressing a warning system malfunction states:

(a) Upon receipt of a credible report of a warning system malfunction, a railroad having maintenance responsibility for the warning system shall promptly investigate the report and determine the nature of the malfunction. The railroad shall take appropriate action as required by § 234.207.(b) Until repair or correction of the warning system is completed, the railroad shall provide alternative means of warning highway traffic and railroad employees in accordance with §§ 234.105, 234.106 or 234.107 of this part. (c) Nothing in this subpart requires repair of a warning system, if, acting in accordance with applicable State law, the railroad proceeds to discontinue or dismantle the warning system. However, until repair, correction, discontinuance, or dismantling of the warning system is completed, the railroad shall comply with this subpart to ensure the safety of the traveling public and railroad employees

49 C.F.R. § 234.103. Further, when a railroad company "receives a credible report of a false activation, a railroad having maintenance responsibility for the highway-rail grade crossing warning system shall promptly initiate efforts to warn highway users and railroad employees at the crossing. . . ." 49 C.F.R. § 234.107.

 Platt relies on South Carolina Code section 57–5–10 (2006), in alleging the Department was responsible for the malfunctioning signals. Section 57–5–10 provides, "The state highway system shall consist of a statewide system of connecting highways which shall be constructed by the Department of

Transportation and which shall be maintained by the department in a safe and serviceable condition as state highways. . . ." In the case at hand, the warning devices in place at Red Bank Road were funded by the FHWA under the Crossings Program. Additionally, the regulations in place gave CSX maintenance responsibility once they received a credible report of a warning system malfunction or false activation. 49 C.F.R. § 234.103. As a result Platt's claims based on state law are pre-empted because the federal regulations subsume the state statute by imposing these duties upon CSX, not the Department.

### III. Proximate Cause

Platt advances the Department's negligence in failing to maintain the traffic signals was a proximate cause of the collision. This issue fails on the merits.

[P]roximate cause is the efficient, or direct, cause-the thing which brings about the injuries complained of. Negligence is not actionable unless it is a proximate cause of the injuries, and it may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided.

*Hughes v. Children's Clinic, P.A.*, 269 S.C. 389, 398, 237 S.E.2d 753, 757 (1977). Proximate cause requires proof of both causation in fact and legal cause. *Oliver v. S.C. Dep't of Hwys. & Pub. Transp.*, 309 S.C. 313, 316, 422 S.E.2d 128, 130 (1992). Causation in fact is proved by establishing the plaintiff's injury would not have occurred "but for" the defendant's negligence. *Id.* Legal cause is proved by establishing foreseeability. *Id.* "Foreseeability is determined by looking to the natural and probable consequences of the act complained of. A plaintiff therefore proves legal cause by establishing the injury in question occurred as a natural and probable consequence of the defendant's negligence." *Vinson v. Hartley*, 324 S.C. 389, 400, 477 S.E.2d 715, 721 (citations omitted).

Ordinarily, the question of proximate cause is one of fact for the jury and the trial judge's sole function regarding the issue is to inquire whether particular conclusions are the only reasonable inferences that can be drawn from the evidence. *Kennedy v. Custom Ice Equip. Co.*, 271 S.C. 171,

246 S.E.2d 176 (1978); *Small v. Pioneer Mach., Inc.,* 329 S.C. 448, 464, 494 S.E.2d 835, 843 (Ct.App.1997); *see also Oliver,* 309 S.C. at 313, 422 S.E.2d at 128 (holding the legal cause component of proximate cause is ordinarily question of fact for jury); *Childers v. Gas Lines, Inc.,* 248 S.C. 316, 149 S.E.2d 761 (1966) (explicating questions of proximate cause are normally within province of jury). The particular facts and circumstances of each case determine whether the question of proximate cause should be decided by the court or by the jury. *Newton v. S.C. Pub. Rys. Comm'n,* 312 S.C. 107, 439 S.E.2d 285 (Ct.App.1993), *rev'd on other grounds,* 319 S.C. 430, 462 S.E.2d 266 (1995). Only when the evidence is susceptible to only one inference does it become a matter of law for the court. *Small,* 329 S.C. at 464, 494 S.E.2d at 843.

■ In the case at bar, Platt failed to prove any negligent act or omission attributable to the Department is the proximate cause of the collision. The record contains no evidence but for a different signal sequence, there would not have been a collision. Several eyewitnesses testified no cars blocked Corley's ability to move forward in the direction of the traffic light in order to clear the tracks. Platt's own expert witness admitted he did not focus on the sequencing of the lights because the gate arm malfunction created the situation leading to the collision.

Witness Ann Turnball, who saw the collision from a nearby parking lot, described the accident:

A: ... I noticed that the car did not move. The lights-the cars in front of him moved, they went forward through the green light. The light turned red. I noticed that the car stayed in that particular position. It didn't move anywhere. I noted a—I then noticed that the bar for the train-the lights came on flashing and I noticed the bar came down and the car was right in front of the bar. I remember hearing whistles and brakes ...

. . .

Q: And he was between the tracks and the arm?

A: Yes, ma'am.

Q: Okay, can you—

A: I then noticed—well, my friend Holly and I had a—we were screaming. I know I was screaming, asking what in the world has that car doing, why wasn't it moving. I then noticed that the rear—the reverse lights on the car came on. And I screamed saying, what are you doing, go forward. I then noticed that the car tried to go forward and stopped.

And then the car's reverse lights came on again, the car tried to back up again and stopped. And then I noticed that the car tried to put all the gas it possibly could to go. And that's when the train hit them.

Holly Anne Daniels, who was in the company of Ann Turnball, testified:

Q: So the warning lights are going off and you looked up and you saw a four-door cream-colored car stopped with—to the extent where the lowering arm would have been behind him?

A: (Nodded.)

Q: Well, did you see the arm come down or was it already down when you noticed the cream-colored vehicle?

A: I remember seeing it start to come down. I don't know if I must have turned my eyes for a second or looked at Ann, because the next thing I remember looking at is when I saw it was down completely. That's when I notice the cream-colored car sitting there.

Q: Okay.

A: At that point Ann and I both got a little frantic, saying, why isn't he moving. There's a—you know, there's a car on the tracks, what's he doing? At that point I noticed when the light was green and there were no cars in front of him, I started to say, go forward, go forward, go forward. At that point I remember seeing his brake lights come on.

He went in reverse for just a second, and he stopped, went forward for second, he kind of jerked forward. The reverse lights came on again to go back. He stopped. And then at the last second I guess he tried to go forward. He, I assumed, gunned the car because the car

started to swivel a little bit and you could hear the tires peeling. And at that point the train hit them.

Another witness in the same parking lot saw the train hit Corley's car. David Wayne Minor similarly stated the Corley moved his car forward and backwards before the collision. Minor was asked about his observations of any traffic ahead of Corley:

Q: Do you recollect whether there were any vehicles directly in front of that car that would have prohibited him from going ahead and driving across the tracks and getting out of the way?

A: ... [t]hey weren't close enough to the tracks to prohibit him from crossing the tracks in this forward movement. Nor do I recall a car being directly behind that gate.

Q: So there was nothing that would physically have obstructed him from going across the track and getting out of the way.

A: In my opinion there wasn't, no.

In his deposition, Platt's expert witness, Dr. Kenneth Heathington, offered a general description of traffic signal preemption. He acknowledged the railroad warning system and the traffic lights were interconnected. However, he admitted the focus of his investigation did not center on the traffic signals:

Q: And what's your understanding of how it worked?

A: Well, it was preempting. In other words, you would—and I didn't look at the traffic signal thing in detail, because I didn't think that's where the problem was, for that—for this particular accident, I thought it was a malfunction of the gate arms. .... Now, I didn't go through and check out exactly how all the signal cycles worked or anything of this nature, because to me, this particular accident was a function of the failure of the gate arm system itself....

Ergo, the trial court did not err in holding there was no genuine issue of material fact as to the proximate cause of the collision.

## CONCLUSION

Based on the foregoing, the trial court's grant of summary judgment is

**AFFIRMED.**

HUFF, J., concurs.

KITTREDGE, J., concurs in a separate opinion.

KITTREDGE, J. (concurring):

I concur in result. I write separately because I would affirm on the sole basis of federal preemption as to the claims against the South Carolina Department of Transportation in connection with the warning devices at the railway crossing. Even assuming the Department owed a duty under state law in connection with the railway crossing warning devices under the facts presented, any such state tort law duty imposed on the Department was preempted by federal law. Concerning the preemption issue, I join in the thorough analysis by Judge Anderson. This would serve as an alternative sustaining ground to the trial court's grant of summary judgment on the basis of a lack of proximate cause. I further find it appropriate to rely on the preemption ground as an alternative sustaining ground, for the issue was squarely before the trial court. *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 526 S.E.2d 716 (2000) (noting that appellate court has discretion to affirm on any ground appearing in the record, especially when issue has been vetted in the trial court). Concerning the trial court's ruling on proximate cause, I concur in the majority opinion's affirmance only insofar as the holding addresses the claims arising from the Department's purported negligence as to the adjacent, state-maintained traffic signal.